IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Ridgeview Manor of the Midlands, L.P., Cimmerson Properties, Inc., and Sterling Healthcare, Inc., ) ) ) ) Plaintiffs, ) ) v. ) ) Michael O. LEAVITT, Secretary of the ) United States Department of Health and ) Human Services, Leslie V. Norwalk, Esq., ) Acting Administrator of the Centers for ) Medicare & Medicaid Services, and ) Robert M. Kerr, Director of the ) South Carolina Department of Health and ) Human Services, ) ) Defendants. ) _____) | C/A No.: 3:07-cv-861-JFA  TEMPORARY RESTRAINING ORDER |

This matter came before the court for an emergency hearing on March 30, 2007, pursuant to plaintiffs' Motion for a Temporary Restraining Order. The court heard arguments from counsel for both plaintiffs and defendants. Upon considering the contents of the Verified Complaint, the Motion for Temporary Restraining Order, and the Memorandum in Support of Motion for Temporary Restraining Order, with exhibits, and the arguments of counsel at the hearing, the court grants the motion. Specifically, the court finds that plaintiffs will suffer irreparable injury if defendants are not immediately 1) restrained from requiring plaintiff Ridgeview Manor of the Midlands, L.P. ("Ridgeview") on this date to issue termination notifications to Medicare residents at its nursing home known as Ridgeview Manor notifying them that they must relocate to another facility by a certain date or waive their right to Medicare reimbursement; and 2) restrained from terminating Ridgeview's Medicare provider agreement on March 30, 2007.

1

The court makes the following findings of fact and conclusions of law:

FINDINGS OF FACT

PARTIES

1.      Ridgeview owns a nursing home known as Ridgeview Manor in Hopkins, South Carolina. Ridgeview participates in the Medicare and Medicaid programs pursuant to a provider agreement with the Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") and applicable federal statutes and regulations. Ridgeview also participates in the Medicaid program pursuant to a provider agreement with the South Carolina Department of Health and Human Services ("SCDHHS") and applicable state and federal statutes and regulations.

2.      Ridgeview provides care under the Medicare and Medicaid programs for twenty-six residents who are beneficiaries thereof. Ridgeview Manor has thirty beds that are dual-certified under the Medicare and Medicaid programs. According to the Verified Complaint, approximately eighty percent of Ridgeview Manor's residents and seventy percent of its gross revenue come from participation in the Medicare and Medicaid programs.

3.      Plaintiff Sterling Healthcare, Inc. ("Sterling") owns and operates fifteen skilled nursing facilities in Florida, Georgia, and North Carolina. Pursuant to a management agreement with Ridgeview dated March 12, 2007, Sterling now operates Ridgeview Manor. Sterling has also entered into a letter of intent with Ridgeview Manor to purchase the Ridgeview Manor Nursing Facility, if certain conditions are met.

4.      Defendant Michael O. Leavitt is Secretary of the United States Department of Health and Human Services ("HHS"), an agency of the United States government. As Secretary, Leavitt is responsible for administering the Medicare and Medicaid programs. CMS is the operating component of HHS charged with the administration of Medicare and Medicaid.

RELEVANT STATUTORY AND REGULATORY FRAMEWORK

5.      To participate in the Medicare and Medicaid programs, a nursing facility like Ridgeview Manor must be in "substantial compliance" with federal participation requirements in sections 1819 and 1919 of the Social Security Act ("SSA"). 42 U.S.C. §§ 1396r, 1395i-3; 42 C.F.R. part 483. "Substantial compliance means a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

6.      Failure to adhere to the federal participation requirements results in "deficiencies." Deficiencies are classified as "Tags" under Appendix P of the State Operations Manual ("SOM"). Tag numbers range from F150 to F522 and are linked to the participation requirements located in 42 C.F.R. part 483.

7.      Deficiencies are further characterized by scope and severity ratings. 42 C.F.R. § 488.408. Nursing homes with "A," "B," or "C" deficiency severity ratings are still in "substantial compliance." "D," "E," and "F" deficiencies pose no actual harm with potential for more than minimal harm to residents. "G," "H," and "I" deficiencies constitute actual harm that does not rise to the level of immediate jeopardy. And, finally, deficiency severity ratings of "J," "K," or "L" represent immediate jeopardy to a resident's health and safety. Deficiency ratings are further classified in terms of scope as "isolated," "pattern," or "widespread."

8.      Remedies are assigned according to the deficiency scope and severity rating. 42 C.F.R. § 488.408. The choice of remedies includes temporary management, denial of payment, civil monetary penalties, state monitoring, transfer of residents, and termination with transfer of residents to other nursing homes. 42 C.F.R. § 488.406.

9.      Although the Division's regulations state that provider agreements may be terminated when the nursing home is not in substantial compliance with participation requirements, whether or not immediate

jeopardy is present, 42 C.F.R. § 488.456, the Medicare Act authorizes termination only in those cases that pose "immediate jeopardy" to resident health and safety. 42 U.S.C. § 1395i-3(h)(2). The state must recommend termination when the nursing home does not achieve substantial compliance within a six month period. 42 C.F.R. § 488.412.

10.     Sections 1819 and 1919 of the SSA give Leavitt, as HHS Secretary, the authority to impose remedies against a facility that is not in substantial compliance with participating requirements. The Secretary has delegated to CMS the authority to impose the remedies. 42 C.F.R. part 488.

11.     CMS's regulations provide that state agencies may conduct inspection surveys to ascertain compliance with the federal participation requirements. 42 C.F.R. §§ 488.10 to 488.28.

12.     The South Carolina Department of Health and Environmental Control's Division of Certification, part of the Bureau of Certification, (the "Division") is the state agency specifically responsible for surveying health facilities that participate in the Medicare and Medicaid programs, including nursing homes. The Division conducts on-site monitoring as necessary when (1) a facility is not in substantial compliance with the requirements and is in the process of correcting deficiencies; (2) a facility has corrected deficiencies and verification of continued substantial compliance is needed; or (3) the survey agency has reason to question the substantial compliance of the facility with a requirement of participation: 42 C.F.R. § 488.332.

13.     The findings from the Division's inspection surveys are delivered in written form to the nursing facilities in a report commonly referred to as a 2567. Nursing facilities are given a certain period of time in which to file with the Division a Plan of Correction which is to specifically address deficiencies cited in the 2567 report.

14.     The Division and CMS, by regulation, provide nursing facilities with the opportunity to contest the Division's 2567 findings in an "Informal Dispute Resolution" ("IDR") proceeding. 42 C.F.R. § 488.331.

15.     Under federal law, nursing facilities are entitled to a hearing before an administrative law judge ("ALJ") to contest CMS's determination of noncompliance. 42 U.S.C. § 1320a-7a(c)(2); 42 C.F.R. §§ 488.408(g); 498.3(b)(12), (13).

SURVEY FINDINGS AND COMPLIANCE ISSUES

16.     The South Carolina State Survey Agency completed a "Life Safety Code and Health Recertification Survey" of the Ridgeview Manor facility on February 14, 2007. By letter of March 5, 2007, the Director of the Bureau of Certification for the South Carolina Department of Health and Environmental Control ("DHEC") sent a Form 2567 to Ridgeview Manor outlining its findings from the survey. The survey alleged 30 deficiencies, 29 of which posed no actual harm to residents of the facility. The findings are summarized as follows:

DHEC SURVEY OF RIDGEVIEW MANOR FINDINGS BY DEFICIENCY SEVERITY RATING

| Substantial compliance | | | Deficiencies pose no actual harm, with potential for more than minimal harm to residents | | | Deficiencies constitutes actual harm that does not rise to the level of immediate jeopardy | | | Deficiencies that that are an immediate jeopardy to resident's health and safety | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J | K | L |
| 0 | 1 | 3 | 13 | 7 | 5 | 1 | 0 | 0 | 0 | 0 | 0 |

DHEC notified Ridgeview Manor that it had found "the most serious deficiencies (sic[1]) in your facility to be isolated deficiencies (sic) that constitute actual harm that is not immediate jeopardy, as evidence

---

[1] As noted above, there was actually only one such alleged deficiency.

5

by the attached CMS-2567 whereby significant corrections are required (G)." As a result of this survey, and prior to any ability of Ridgeview Manor to respond to these deficiency allegations, DHEC recommended the discretionary termination of the Medicare provider agreement, discretionary denial of payment for new admissions effective March 22, 2007, and civil monetary penalties effective February 14, 2007.

17. Although DHEC had not determined that there was any immediate jeopardy to the residents of the facility, and prior to any response to the allegations by Ridgeview Manor, CMS sent a notice of involuntary termination to Ridgeview Manor on March 8, 2007. CMS noted DHEC's determination that Ridgeview Manor was "out of substantial compliance with the requirements specified at sections 1819(b), (c), (d) and (e) of the Social Security Act and the implementing regulations at 42 C.F.R, Part 483." Based on the survey findings, CMS imposed the following remedies: (a) involuntary termination of Ridgeview Manner's Medicare and Medicaid provider agreements, effective March 30, 2007, (b) mandatory denial of Medicare or Medicaid payments for new admissions, effective as of March 24, 2007, and (c) a civil monetary penalty of $850.00 per day, effective February 14, 2007 and continuing until the facility is terminated.

18. By letter dated March 9, 2007, SCDHHS notified Ridgeview Manor that it must canvass all South Carolina Medicare and Medicaid certified nursing facilities for available beds, and must arrange for the transfer of the Medicare and/or Medicaid eligible nursing home residents to other facilities.

19. Ridgeview Manor of the Midlands, L.P. decided to sell the assets of the facility to Sterling, and on March 9, 2007, entered a preliminary letter of intent to that effect. The sale is contingent upon CMS not terminating Ridgeview Manor's Medicare provider agreement, and the acceptance by CMS of the transfer of the Medicare and Medicaid provider agreements from Ridgeview Manor to Sterling. In addition, the letter of intent from Sterling notes that "[w]e are prepared to take control of this facility immediately in order to start the process of getting back into compliance with all State and Federal

regulations as soon as possible." Sterling entered a management agreement for the operation of Ridgeview Manor on March 12, 2007.

20.     At the direction of management provided by Sterling, Ridgeview Manor submitted to DHEC a "plan of correction" providing credible evidence of compliance responsive to every deficiency alleged by the state surveyor. The corrective action plan does not admit any of the alleged deficiencies, but responds specifically to every allegation noting actions taken in response to the state surveyors allegations. On March 23, 2007, DHEC responded to the proposed corrective action plan, noting simply that it was "not acceptable and a revisit will not be authorized by CMS. Your provider agreement will be terminated on March 30, 2007 as noticed to you in the CMS letter dated March 8, 2007."

21.     On March 26, 2007, counsel for Sterling emailed counsel for CMS an outline of the terms and conditions of Sterling's proposed purchase of Ridgeview Manor. This email outlined Sterling's management of Ridgeview Manor, its intent to purchase Ridgeview Manor, its willingness to post a bond to ensure compliance with the plan of correction and maintenance of compliance with the certification standards, and requested delay of the termination of provider agreement to allow time to execute the asset purchase agreement. On March 29, 2007, counsel for CMS informed plaintiffs' counsel that CMS would not delay the termination of Ridgeview Manor's provider agreement.

22.     As of March 30, 2007, CMS has refused to delay the termination of Ridgeview Manor's provider agreement and has ordered Ridgeview Manor to notify their residents of their immediate need to be relocated.

23.     As soon as residents are notified, the relocations will begin. This will result in the loss of revenues from the Medicare program.

24.     For a period not to exceed 30 days from the date of termination, the Medicare program will continue to reimburse Ridgeview Manor for services provided to those beneficiaries who were residents

7

in the facility on the date of termination, while arrangements are being made to transfer them to other facilities.

25.     Plaintiffs have requested an expedited administrative hearing under 42 C.F.R. Part 498 to contest the grounds of termination, but said hearing cannot be held before notice is required to be given to the Medicare residents on March 30, 2007. It is furthermore unlikely that a hearing will be held before the termination and revocations are completed. The decision of the administrative law judge is likely to be issued even later.

26.     With regard to the likelihood of irreparable harm to the plaintiffs, relocation of Medicare and Medicaid residents may require the closure of Ridgeview Manor; further, requiring the relocation of elderly and ill Medicare and Medicaid patients within the next month are likely to cause them and their families' irreparable harm.

27.     With regard to the likelihood of irreparable harm to the defendants, defendants will suffer no harm if a temporary restraining order is issued because the order will result only in the agencies' continued payment for covered services furnished to eligible beneficiaries, which are payments the agencies would also make if the beneficiaries were transferred to other facilities with Medicare provider agreements.

28.     If the residents stay within the plaintiffs' facilities, they are unlikely to suffer harm for several reasons. First, the survey only found one deficiency that constituted actual harm, but DHEC specifically found that such deficiency did not rise to the level of immediate jeopardy. Second, the plaintiffs' corrective action plan notes that it has already corrected this deficiency. Third, Ridgeview Manor is now under the management of Sterling, which appears to be highly qualified and experienced in the management of skilled nursing facilities in the southeast, and which has agreed to ensure compliance with the plan of correction and maintenance of compliance with the certification standards. In addition,

relocation of residents to other facilities is an event that causes stress to residents of nursing homes and carries a risk of harm to the residents' health and well-being.

29. With regard to the likelihood of plaintiffs' success on the merits, the court finds that the factors presented in paragraphs 26-28 above weigh in favor of the plaintiffs, and further that based on the Verified Complaint, grave and serious questions are presented as to the merits.

30. There is no public interest that would be harmed by delaying the revocation of the Ridgeview Manor's Medicare and Medicaid billing privileges or the termination of their provider agreements until after the Ridgeview Manor has been able to challenge the grounds of the revocations and terminations and a decision is given after an administrative hearing.

## CONCLUSIONS OF LAW

31. This court finds it has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 of plaintiffs' claim that the procedures utilized by defendants to effectuate a termination of plaintiffs' Medicare and Medicaid billing privileges and provider agreements are constitutionally inadequate because they force such providers to incur a devastating loss before the nursing home can access the appeals process. These procedural due process issues appear to be matters that are wholly collateral to the determination of benefits, and the plaintiffs' interest in having a determination on these matters prior to exhausting their administrative remedies is so great that deference to a decision by the Secretary whether to waive the remaining administrative procedures to accomplish the exhaustion requirements is inappropriate.

32. The court finds that immediate and irreparable injury, loss, or damage will result to the plaintiffs.

33. Under the four-part hardship balancing test for evaluating a request for injunctive relief, required by Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc., 550 F.2d 189 (4th Cir. 1977), and Virginia Carolina Tools, Inc. v. International Tool Supply, Inc., 984 F.2d 113 (4th Cir. 1993), issuance of a Temporary Restraining Order here is appropriate:

    (a)    There is a likelihood of irreparable harm to plaintiffs through the loss of their revenues, the relocation of their Medicare and Medicaid residents, and the likelihood of closure of Ridgeview Manor if a restraining order is not issued;

    (b)    No harm will be suffered by defendants in the court's issuing a restraining order because the defendants will likely be paying the same fees for the affected Medicare and Medicaid residents, regardless of what facility the residents are located;

    (c)    There is not a likelihood of harm to plaintiffs' residents if a restraining order is issued because the most recent DHEC survey did not find any immediate harm to the residents and because the plaintiffs have adopted a corrective action plan to which CMS has not substantively responded;

    (d)    A balance of the irreparable harm to the parties weighs heavily in favor of the plaintiffs. Further, based on the Verified Complaint, the plaintiffs have presented grave and serious questions as to the merits. Thus, the plaintiffs need not demonstrate a likelihood of success on the merits. See Blackwelder, 550 F.2d at 196.

    (e)    The consideration of public interest factors weighs heavily in favor of granting the temporary restraining order to the extent that the elderly and poor nursing home patients may be forced to relocated if the temporary restraining order is not granted, causing a substantial burden to the elderly and poor patients. No public interest will be served by displacing and relocating these patients. Further, no public interest will be served by denying plaintiffs an administrative hearing prior to the revocation of their Medicare and Medicaid billing privileges and termination of their Medicare and Medicaid provider agreements.

Whereas, plaintiffs have posted bond in the amount of $100,000 this day, IT IS ORDERED:

1.    Defendants, their agents and all those acting in privity with them, are hereby enjoined from:

    A.    Requiring plaintiffs to send out any Notice of Termination to affected Medicare or Medicaid residents notifying them of the requirement that they be relocated on or after March 30, 2007;

    B.    Revoking plaintiffs' Medicare and Medicaid billing privileges or terminating their Medicare and Medicaid provider agreements until the plaintiffs have been afforded a hearing and the revocation and termination actions are upheld by the hearing officer, while this Temporary Retraining Order is in effect;

    C.    Involuntarily relocating the plaintiffs' residents prior to the hearing on the preliminary injunctive relief sought in the Verified Complaint; and,

    D.    Making efforts to relocate plaintiffs' residents prior to the hearing on the preliminary injunctive relief sought by the complaint, except that defendants may

        (i)    identify reasonably appropriate alternative placement in the event the decertification and termination actions are upheld by the hearing officer;

        (ii)    develop a plan to minimize any transfer trauma or stress to the residents in the event the decertification and termination actions are upheld by the hearing officer; and,

        (iii)    counsel the residents or their guardians or representative as to available community resources.

2.    This restraining order shall remain in effect until April 5, 2007, unless extended by court order.

3.    The court shall conduct a hearing on the preliminary injunctive relief sought in the Verified Complaint on April 5, 2007 at 10 a.m.

IT IS SO ORDERED.

March 30, 2007                                                        s/ Joseph F. Anderson, Jr.
Columbia, South Carolina                               United States District Judge