IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Ridgeview Manor of the Midlands, L.P., Cimmerson Properties, Inc., and Sterling Healthcare, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Michael O. Leavitt, Secretary of the United States Department of Health and Human Services, Leslie V. Norwalk, Esq., Acting Administrator of the Centers for Medicare & Medicaid Services, and Robert M. Kerr, Director of the South Carolina Department of Health and Human Services, <br><br> Defendants. | C/A No.: 3:07-cv-861-JFA <br><br><br><br><br><br><br><br> ORDER GRANTING <br> PRELIMINARY INJUNCTION |

I.     Introduction

Plaintiff Ridgeview Manor of the Midlands, L.P. ("Ridgeview"), a provider of nursing home services, sues for a TRO, preliminary injunction and permanent injunction to prevent defendants from terminating its Medicare and Medicaid provider agreements at its Ridgeview Manor facility in Hopkins, South Carolina, prior to a decision on the merits of said termination. Plaintiff's merits appeal of the termination is currently pending before an Administrative Law Judge.

After an emergency hearing on March 30, 2007, the court granted a TRO upon plaintiffs' posting of a $100,000 bond, and scheduled a hearing for April 5, 2007, to determine whether the TRO should be converted to a preliminary injunction. Upon consideration of the briefs, the arguments of counsel, and the testimony at the hearing, the court grants the preliminary injunction.

1

Specifically, the court finds that plaintiffs will suffer irreparable injury if defendants are not restrained from revoking plaintiffs' Medicare and Medicaid billing privileges, and any payments due thereunder, and from terminating plaintiffs' Medicare and Medicaid provider agreements (including the ability to admit new patients), until plaintiffs have been afforded a hearing on their administrative review, up to and including an appeal to the Departmental Appeals Board. In making its ruling, the court makes the following findings of fact and conclusions of law:

II.     Findings of Fact

   A.     Parties

Ridgeview owns a nursing home known as Ridgeview Manor in Hopkins, South Carolina. Ridgeview participates in the Medicare and Medicaid programs pursuant to a provider agreement with the Centers for Medicare and Medicaid Services ("CMS") and applicable federal statutes and regulations. CMS is the operating component of the United States Department of Health and Human Services. Ridgeview also participates in the Medicaid program pursuant to a provider agreement with the South Carolina Department of Health and Human Services ("SCDHHS") and applicable state and federal statutes and regulations.

Twenty eight of Ridgeview Manor's thirty dual-certified beds are occupied by residents who are beneficiaries of the Medicare and Medicaid programs. According to the Verified Complaint, approximately eighty percent of Ridgeview Manor's residents and seventy percent of its gross revenue come from participation in the Medicare and Medicaid programs.

Plaintiff Sterling Healthcare, Inc. ("Sterling") owns and operates fifteen skilled nursing facilities in Florida, Georgia, and North Carolina. Pursuant to a management agreement with

Ridgeview dated March 12, 2007, Sterling now operates Ridgeview Manor. Sterling has also entered into a letter of intent with Ridgeview to purchase the Ridgeview Manor.

B.     Relevant Statutory and Regulatory Framework

Ridgeview Manor's participation in the Medicare and Medicaid programs is governed by a complex statutory and regulatory regime. See generally, 42 U.S.C §§ 1395i-3, et seq. and 1396r, et seq. Specifically, Ridgeview Manor must be in "substantial compliance"[1] with federal participation requirements in sections 1819 and 1919 of the Social Security Act ("SSA"). Id., and 42 C.F.R. part 483. Failure to adhere to the federal participation requirements results in "deficiencies," which are characterized by scope and severity ratings as follows: (1) deficiencies in substantial compliance (A, B or C); (2) deficiencies that pose no actual harm, with potential for more than minimal harm (D, E or F); (3) deficiencies that constitute actual harm that does not rise to the level of immediate jeopardy (G, H or I); and (4) deficiencies that represent immediate jeopardy to a resident's health and safety (J, K or L). 42 C.F.R. § 488.408.

The Secretary has delegated its authority to CMS to impose remedies against a facility that is not in substantial compliance with participating requirements. 42 C.F.R. § 488. CMS's regulations provide that state agencies may conduct inspection surveys to ascertain compliance with the federal participation requirements. 42 C.F.R. §§ 488.10 to 488.28. The state agency responsible for surveying health facilities that participate in the Medicare and Medicaid programs is the Division of Certification ("Division") within the Bureau of the South Carolina Department of Health and

---

[1] "Substantial compliance means a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

3

Environmental Control ("DHEC"). Under federal law, nursing facilities are entitled to a hearing before an ALJ to contest CMS's determination of noncompliance.

The court is informed that the crux of plaintiff's appeal to the ALJ concerns whether its provider agreements may be terminated when the nursing home is not in substantial compliance with participation requirements, where no immediate jeopardy is present. The Division's regulations provide that such termination is permissible. See 42 C.F.R. § 488.456. However, plaintiff argues that the Medicare Act authorizes termination only in those cases that pose "immediate jeopardy" to resident health and safety. 42 U.S.C. § 1395i-3(h)(2).

  C. Survey Findings and Compliance Issues

On February 14, 2007, the relevant state agency conducted an inspection survey of Ridgeview Manor. By letter of March 5, 2007, the DHEC Director sent Ridgeview a report of its agency's survey findings which alleged 30 deficiencies, 29 of which posed no actual harm to residents of the facility. The findings are summarized as follows:

DHEC SURVEY FINDINGS BY DEFICIENCY SEVERITY RATING

| Substantial compliance | | | Deficiencies posing no actual harm, with potential for more than minimal harm | | | Deficiencies constituting actual harm not rising to level of immediate jeopardy | | | Deficiencies that that are an immediate jeopardy to resident's health and safety | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** | **H** | **I** | **J** | **K** | **L** |
| 0 | 1 | 3 | 13 | 7 | 5 | 1 | 0 | 0 | 0 | 0 | 0 |

The report reveals that plaintiff's most egregious violation (level G) resulted from its failure to provide pain management to one of two sampled residents having ulcer dressings removed. According to the report, the resident repeatedly indicated feeling pain during the dressing removal and plaintiff's nurse failed to provide pain control or pain medication, which plaintiff later

4

acknowledged should have been given. Additionally, in one of ten sampled residents, plaintiff failed to provide the correct loading dosage for a certain prescription medication, administering the medication once a day instead of the prescribed twice a day.

In contrast, plaintiff's numerous other deficiencies either "caused no actual harm to the residents with only the potential to cause the residents minimal harm" or were otherwise in substantial compliance with the regulations. Many of these deficiencies involved administrative or documentation matters. For example, plaintiff was cited for neglecting to post information at its facility on how residents could obtain refunds for previous payments covered by Medicare/Medicaid programs, failing to post the results of the most recent standard survey conduct by state surveyors, neglecting to electronically transmit "encoded, accurate complete Minimum Data Set (MDS) Assessment data" to the state since December 28, 2006, and failing to ensure that certain documentation related to the inspection of its fire alarm system was readily available  Additionally, plaintiff was cited for failing to conduct fire drills for each shift on a quarterly basis.

In summary, only one deficiency, out of thirty alleged deficiencies, was categorized in the report as constituting "actual harm that does not rise to the level of immediate jeopardy." There were no deficiencies alleged that caused immediate jeopardy to the resident's health or safety.

DHEC notified Ridgeview Manor that it had found "the most serious deficiencies (sic[2]) in your facility to be isolated deficiencies (sic) that constitute actual harm that is not immediate jeopardy, as evidence by the attached CMS-2567 whereby significant corrections are required (G)." As a result of the survey, and prior to any ability of Ridgeview Manor to respond to the deficiency allegations, DHEC recommended the discretionary termination of the Medicare provider agreement, discretionary denial of payment for new admissions effective March 22, 2007, and civil monetary

---

[2]  As noted above, there was actually only one such alleged deficiency.

penalties effective February 14, 2007. Pursuant to DHEC's recommendation, CMS sent a notice of involuntary termination to Ridgeview Manor on March 8, 2007, determining that Ridgeview Manor was "out of substantial compliance with the requirements specified at sections 1819(b), (c), (d) and (e) of the Social Security Act and the implementing regulations at 42 C.F.R, Part 483." Based on the survey findings, CMS imposed the following remedies: (a) involuntary termination of Ridgeview's Medicare and Medicaid provider agreements, effective March 30, 2007, (b) mandatory denial of Medicare or Medicaid payments for new admissions, effective as of March 24, 2007, and (c) a civil monetary penalty of $850.00 per day, effective February 14, 2007 and continuing until the facility is terminated.

By letter dated March 9, 2007, SCDHHS directed Ridgeview Manor to canvass all Medicare and Medicaid certified nursing facilities in the state for available beds and to arrange for the transfer of the Medicare and/or Medicaid eligible nursing home residents to other facilities.

Ridgeview decided to sell the assets of the facility to Sterling, and on March 9, 2007, entered a preliminary letter of intent to that effect.[3] Sterling entered a management agreement for the operation of Ridgeview Manor on March 12, 2007.

At the direction of management provided by Sterling, Ridgeview Manor submitted to DHEC a "plan of correction," which, while not admitting the findings of deficiencies, specifically answers each allegation with actions taken in response to the state surveyors allegations. On March 23, 2007, DHEC responded to the proposed corrective action plan, noting simply that it was "not acceptable and a revisit will not be authorized by CMS. Your provider agreement will be terminated on March 30, 2007 as noticed to you in the CMS letter dated March 8, 2007."

---

[3] The sale is contingent upon CMS not terminating Ridgeview Manor's Medicare provider agreement, and the acceptance by CMS of the transfer of the Medicare and Medicaid provider agreements from Ridgeview Manor to Sterling.

On March 26, 2007, counsel for Sterling emailed counsel for CMS an outline of the terms and conditions of Sterling's proposed purchase of Ridgeview Manor. This email outlined Sterling's management of Ridgeview Manor, its intent to purchase Ridgeview Manor, its willingness to post a bond to ensure compliance with the plan of correction and maintenance of compliance with the certification standards, and requested delay of the termination of provider agreement to allow time to execute the asset purchase agreement. On March 29, 2007, counsel for CMS informed plaintiffs' counsel that CMS refused to delay the termination of Ridgeview Manor's provider agreement and ordered Ridgeview to notify their residents of their immediate need to be relocated. This court's TRO dated March 30, 2007, stayed the termination of plaintiff's provider agreements and the relocation notification to the residents.

Plaintiffs have requested an expedited administrative hearing under 42 C.F.R. Part 498 to contest the grounds of termination. Plaintiffs represented to the court that the appeals board will render a decision on their request for an expedited hearing by April 13, 2007, with a decision on the merits of the appeal to issue thereafter.

III.   Conclusions of Law

   A.   Jurisdiction

The principal motion before the court is plaintiff's motion for a preliminary injunction. However, before turning to the merits of that motion, the court first must resolve the question raised as to this court's subject matter jurisdiction over this controversy.

Plaintiff claims this court has jurisdiction over this action under 28 U.S.C. §§ 1331 and the Eldridge[4] exception to the requirement of exhaustion of administrative remedies, the due process clause of the United States Constitution, 1361 (mandamus), and the court's general equitable powers.

---

[4]   Mathews v. Eldridge, 424 U.S. 319 (1976).

Defendants contend that the court has no statutory basis for jurisdiction in this case and that plaintiff first must exhaust its available administrative remedies before a court may assume jurisdiction over a challenge to a termination decision.

The court finds that this case is distinguishable from the case law cited by defendants, as plaintiff's cause of action concerns the very question of administrative remedies. If plaintiff were requesting this court to set aside the substantive decision to terminate plaintiff's provider agreement, then the exhaustion of administrative remedies would indeed be a prerequisite to this court assuming jurisdiction. The case before this court, however, appears to be entirely collateral to the merits of the decision to terminate Ridgeview's provider agreements.

The issue before this court is whether to stay the termination of Ridgeview's provider agreements until plaintiffs have been afforded a hearing on their administrative review, up to and including an appeal to the Departmental Appeals Board.  Plaintiff's claim in the appeal appears to be that the Secretary's termination of Ridgeview's provider agreements prior to a pretermination hearing violates the applicable Medicare and Medicaid statutes.  It is possible, as defendants argue, that plaintiffs will ultimately return to this court seeking a substantive ruling on the merits of the appeal.  However, at this time, the question before this court is strictly a legal one—whether a stay should issue pending a ruling on that appeal.

To be excused from the administrative exhaustion requirement, plaintiff must show that (1) the suit involves a collateral attack rather than one on the merits; and (2) its interest in prompt judicial review is so compelling that deference to the agency's determination is inappropriate. Johnson v. Sullivan, 922 F.2d 346, 352-353 (7th Cir. 1990); see also Bowen v. City of New York, 476 U.S. 467, 483 (1986)(citing Mathews v. Eldridge, 424 U.S. 319 (1976)).

8

Defendants argue that this court lacks subject matter jurisdiction for the reasons stated in Cathedral Rock of North College Hill, Inc. v. Shalala, 223 F.3d 354 (2000). The court finds Cathedral Rock distinguishable from the facts here. First, in Cathedral Rock, plaintiff directly challenged the Secretary's substantive determination that the facility was not in substantial compliance with the regulations and challenged the termination from the programs. Id. at 357. Plaintiffs here, however, do not directly challenge the Secretary's termination, but merely seek a stay pending an administrative appeal of the termination decision.

Second, unlike the Cathedral Rock plaintiff, Ridgeview has shown that it will effectively have no judicial review before irreparable harm ensues. The record is replete with evidence of the harm that Ridgeview would suffer if it is forced to wait until the administrative procedures are exhausted before it can obtain review of the Secretary's decision to terminate. Ridgeview Manor's very existence is threatened, as 80% of its residents and 70% of its gross revenues come from participation in the Medicare and Medicaid programs. While technically entitled to an appeal, the appeal will be wholly ineffective to remedy the loss Ridgeview would suffer if it wrongfully loses its provider agreements.

Third, in contrast to the holding in Cathedral Rock, the Fourth Circuit has ruled on several occasions that a constitutional claim is wholly collateral to a claim of benefits, such that the exception to the full exhaustion of the administrative remedies created by Eldridge applies to justify this court's jurisdiction. See, e.g., Hyatt v. Heckler, 807 F.2d 376 (4th Cir. 1986), Ram v. Heckler, 792 F.2d 444 (4th Cir. 1986).

For the foregoing reasons, the court finds it has jurisdiction of plaintiffs' claim that the procedures utilized by defendants to effectuate a termination of plaintiffs' Medicare and Medicaid billing privileges and provider agreements are constitutionally inadequate because they force such

9

providers to incur a devastating loss before the nursing home can access the appeals process. These procedural due process issues appear to be matters that are wholly collateral to the determination of benefits, and the plaintiffs' interest in having a determination on these matters prior to exhausting their administrative remedies is so great that deference to a decision by the Secretary whether to waive the remaining administrative procedures to accomplish the exhaustion requirements is inappropriate. See also, Claridge House, Inc. v. United States Dep't of Health and Human Services, 795 F.Supp. 1393, 1401 (S.D. Ohio 1991); Mediplex v. Shalala, 39 F.Supp. 2d 88 (D. Mass. 1999), International Long Term Care v. Shalala, 947 F.Supp. (D.D.C. 1996), Libbie Rehab. Center v. Shalala, 26 F.Supp. 2d 128 (D.D.C. 1998); Mountview Nursing & Rehabilitation Center, Inc. v. United States Dep't of Health & Human Services, Civ. A. No. 1:CV-93-1692, slip op at 5-6 (M.D. Pa. Nov. 17, 1993)(cited in Mediplex); Frontier Health v. Shalala, 113 F.Supp. 1192, 1193 (E.D. Tenn. 2000); Cooke Associates of Fork, Inc. v. Leavitt, 4:06-cv-3635 (D.S.C. 12/28/06, J. Harwell).

    B.    Preliminary Injunction

        1.    Standard

A preliminary injunction is an extraordinary remedy and should be only be granted in those "limited circumstances" that clearly demand it. See Homestore Mobility Techs, Inc. v. HR Solutions, Inc., 178 F.Supp.2d 584 588 (M.D.N.C. 2001)(citing Direx Israel, Ltd. v Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1992)). The purpose of granting this unusual remedy is to "preserve the status quo during the course of a litigation, in order to prevent irreparable injury to the moving party and in order to preserve the ability of the court to render complete relief." Federal Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 499 (4th Cir. 1981).

The United States Court of Appeals for the Fourth Circuit has articulated four factors for a court to consider when deciding whether to grant a motion for a preliminary injunction. These

factors are: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. CIENA Corp. v. Jarrard, 203 F.3d 312, 322 (4th Cir. 2000) (citing Blackwelder Furniture Co.v. Seilig Mfg. Co., 550 F.2d 189, 193-96 (4th Cir. 1977)).

The two most critical factors a court will consider are (1) the probable harm to the plaintiff if an injunction is not issued, and (2) the likely harm to the defendant if an injunction is issued. Rockford Mfg. v. Bennet, 296 F.Supp.2d 681, 684 (D.S.C. 2003). The plaintiff's harm must be "neither remote nor speculative, but actual and imminent." Direx, 952 F.2d at 812. Once a plaintiff sufficiently demonstrates the likelihood of irreparable harm, the court will then balance the plaintiff's harm against the likelihood of the defendant's injury if the injunction is granted. Id. at 813.

If the balance of these two factors tips decidedly in favor of the moving party, a preliminary injunction will be granted if the plaintiff has "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus more deliberate investigation." Rockford, 296 F.Supp.2d at 685. If, on the other hand, the balance does not tip decidedly in the plaintiff's favor, then the plaintiff must demonstrate a strong probability of success on the merits in order to obtain a preliminary injunction. Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1992). Finally, a court will also evaluate the public interest at stake in determining whether to grant the preliminary injunction. Direx, 952 F.2d at 812.

    2.    Application

Under the four-part hardship balancing test above, the court finds issuance of a preliminary injunction is appropriate. First, there is a likelihood of irreparable harm to plaintiffs through the loss of their revenues, the relocation of their Medicare and Medicaid residents, and the likelihood of

11

closure of Ridgeview Manor if an injunction is not issued—none of which could be restored if the facility were ultimately successful on appeal.

Second, as conceded by counsel for the government at the hearing, no harm will be suffered by the government in the court's issuing an injunction because the government will be paying the same fees for the affected Medicare and Medicaid residents, regardless of which facility the residents are located. While the government has voiced a concern about the quality of care at Ridgeview Manor, it conceded at the hearing that it has not visited the facility since Sterling implemented its corrective plan, and significantly, it does not plan to resurvey, so its suggestion that any deficiencies remain are speculative. There does not appear to be a strong likelihood of harm to plaintiffs' residents if an injunction is issued because the most recent DHEC survey did not find any immediate harm to the residents and plaintiffs have presented uncontradicted testimony that the deficiencies have been corrected.

Additionally, the court found persuasive the testimony by Ms. Kristie Dorsey, a licensed nurse with 27 years experience, who works as an administrator consultant and trainer with Sterling. She testified that relocation of the patients from Ridgeview Manor would likely cause transfer trauma—increasing the possibility of death or serious illness for elderly, infirm patients. She also testified that the patients' associational interests, such as friendship among patients and staff and family ties, will likely be disrupted if the patients are scattered to other nursing homes in the state. Ms. Dorsey noted that one patient is more than 100 years old and eight of the patients are categorized as hospice residents, with life expectancies of less than six months, many with late stage dimentia, schizophrenia, anxiety, and depression, among other diseases. Seven of the eight hospice residents are Medicare patients. Additionally, some of the patients themselves and their families submitted affidavits that they were pleased with the quality of care at the facility and do not wish to be moved,

some of the family members noting that they lack transportation to visit their loved ones should they be forced to relocate to another facility out of town. In sum, Ms. Dorsey testified that the residents may encounter severe emotional and physical hardship as a result of being transferred to another facility. The court finds that a balance of the irreparable harm to the parties weighs heavily in favor of the plaintiffs.

Further, based on the Verified Complaint, the plaintiffs have presented grave and serious questions as to the merits. Thus, the plaintiffs need not demonstrate a likelihood of success on the merits. See Blackwelder, 550 F.2d at 196. However, a brief analysis of the merits of plaintiffs' claim supports a finding for likely recovery on the merits of its claim on due process grounds.

The basic due process issue presented is whether the Secretary must provide a nursing facility such as Ridgeview Manor with an administrative hearing and with a continuation of benefits pending the outcome of that hearing before terminating the facility provider's agreement, in the absence of a finding by the Secretary that the facility's noncompliance immediately jeopardizes the health and safety of its residents.

Plaintiffs rely upon the Medicare Act, 42 U.S.C. 1395i-3(h)(2), to support their argument that the Secretary's authority to terminate a facility's participation is limited to cases where there is a finding that the deficiencies immediately jeopardize the health and safety of its residents. The Medicare Act provides that if the Secretary finds that a nursing facility is noncompliant, and further finds that the deficiencies "immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the [appointment of temporary management], or terminate the facility's participation." 1395i-3(h)(2)(A)(i). However, if the Secretary finds that the deficiencies "do not immediately jeopardize the health or safety of its residents, the Secretary" may deny payment, impose civil money penalties,

13

and appoint temporary management. 1395i-3(h)(2)(A)(i). Because none of the alleged deficiencies at Ridgeview Manor were found to place residents' health and safety in immediate jeopardy, plaintiffs assert that the likelihood of success prong has been satisfied.

On the other hand, the Secretary argues that he has discretionary authority to terminate a facility's provider agreement. The Secretary relies upon 42 U.S.C. 1395cc(b)(2) which authorizes the Secretary to "terminate [a provider] agreement after the Secretary . . . has determined that the provider fails to comply substantially with the provisions" of the agreement, statute, or regulations. Because this provision lacks the "immediate jeopardy" qualification, the Secretary argues that termination is not limited to such findings. Furthermore, the Secretary argues that the statute relied upon by plaintiff expressly prohibits construction of the statute as restricting remedies available to the Secretary. 42 U.S.C. 1395i-3(h)(2)(A)(i). Thus, the Secretary concludes that he is permitted to terminate for non-jeopardy deficiencies, and as such, the plaintiff cannot satisfy the likelihood of success on the merits necessary for an injunction.

Although the Fourth Circuit has yet to address the scope of the Secretary's authority in terminating a nursing facility's Medicare agreement, this court finds persuasive the reasoning of the court in Claridge House, Inc. v. U.S. Dep't of Health & Human Svc., 795 F. Supp. 1393, 1404, interpreting substantially similar provisions of the Medicaid Act as limiting the Secretary's authority to terminate provider agreements to situations involving a finding of immediate jeopardy:

> Fundamentally, if the Secretary could terminate a facility with or without a finding of immediate jeopardy, there would be little point in distinguishing, as [the statute] clearly does, between situations of immediate jeopardy and situations of no immediate jeopardy. Second, the general language . . . on which the Secretary relies refers to options available to the . . . Secretary "to remedy a nursing facility's deficiencies." Unlike denial of further payments, imposition of civil penalties, and appointment of temporary management, the remedies expressly set forth in [the statute], termination of a facility's provider agreement cannot be seen as a means to "remedy a nursing facility's deficiencies."

Therefore, the court finds that plaintiff has demonstrated a likelihood of success on the merits.

Finally, the consideration of public interest factors weighs heavily in favor of granting the temporary restraining order to the extent that the elderly and poor nursing home patients may be forced to relocated if the temporary restraining order is not granted, causing them a substantial burden. No public interest will be served by displacing and relocating these patients.

While the public has a strong interest in ensuring that elderly and infirm patients are not required to stay in noncomplying nursing homes "longer than is necessary to assure that the provider had adequate notice and opportunity to respond to charges of deficiencies," O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 779 (1980)(internal citations omitted), it does not appear in the instant case that plaintiffs have been afforded an opportunity to respond to the charges of deficiencies before CMS terminated its provider agreements. The court finds that no public interest will be served by denying plaintiffs an administrative hearing prior to the revocation of their Medicare and Medicaid billing privileges and termination of their Medicare and Medicaid provider agreements.

For the foregoing reasons, the court determines a preliminary injunction is appropriate. Therefore, IT IS ORDERED that:

- A. Defendants are prohibited from revoking plaintiffs' Medicare and Medicaid billing privileges, and any payments due thereunder, and from terminating plaintiffs' Medicare and Medicaid provider agreements, until plaintiffs have been afforded a hearing on their administrative review, up to and including an appeal to the Departmental Appeals Board;

- B. Defendants are prohibited from revoking plaintiffs' ability to admit new Medicare and Medicaid patients under the Medicare and Medicaid provider agreements until plaintiffs have been afforded a hearing on their administrative review, up to and including an appeal to the Departmental Appeals Board;

- C. Defendants are prohibited from involuntarily relocating the residents of Ridgeview Manor during the pendency of such appeal; and,

D. Defendants are prohibited from relocating the residents of Ridgeview Manor during the pendency of such appeal, except that defendants may

    (i) identify reasonably appropriate alternative placement in the event the decertification and termination actions are upheld by the hearing officer;

    (ii) develop a plan to minimize any transfer trauma or stress to the residents in the event the decertification and termination actions are upheld by the hearing officer; and,

    (iii) counsel the residents or their guardians or representative as to available community resources.

E. Defendants are prohibited from terminating plaintiffs' Medicare and Medicaid provider agreements until 15 days from the date of the decision by the ALJ and/or Departmental Appeals Board, if, after appeal to the ALJ, CMS is permitted to terminate plaintiffs' Medicare and Medicaid provider agreements and revoke plaintiffs' billing privileges.

IT IS SO ORDERED.

April 9, 2007  
Columbia, South Carolina

s/ Joseph F. Anderson, Jr.  
United States District Judge